**FILED**

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

**MAR 2 8 2013**

CLERK

FEDERAL TRADE COMMISSION,　　　*　　　CIV 11-3017-RAL
　　　　　　　　　　　　　　　　　　*
　　　　Plaintiff,　　　　　　　　　*
　　　　　　　　　　　　　　　　　　*　　　OPINION AND ORDER
vs.　　　　　　　　　　　　　　　　*　　　DENYING DEFENDANTS'
　　　　　　　　　　　　　　　　　　*　　　MOTION FOR PARTIAL
PAYDAY FINANCIAL, LLC, et al.,　　*　　　SUMMARY JUDGMENT
　　　　　　　　　　　　　　　　　　*
　　　　Defendants.　　　　　　　　*

　　　　The pending motion for partial summary judgment presents the issue of tribal court

jurisdiction over non-Indians who contract with a company doing business from an Indian

reservation. The "pathmarking" case on tribal authority over nonmembers is <u>Montana v. United

States</u>, 450 U.S. 544 (1981). <u>See</u> <u>Strate v. A-1 Contractors</u>, 520 U.S. 438, 445 (1997)

(describing <u>Montana</u> as "pathmarking" and applying <u>Montana</u> to evaluate tribal court jurisdiction

authority over non-Indians.) In <u>Montana</u>, the Supreme Court recognized two areas in which

Indian tribes have sovereign power to exercise authority over nonmembers on their reservation.

The first such "<u>Montana</u> exception" recognizes tribal authority over "the activities of

nonmembers who enter consensual relationships with a tribe or its members, through commercial

dealing, contracts, leases, or other arrangements." <u>Montana</u>, 450 U.S. at 565. The precise

question presented in this case is one of first impression: When a company conducting business

from an Indian reservation enters into a commercial contract with a non-Indian, is it an unfair

and deceptive practice for the company to include forum selection and consent to tribal

jurisdiction provisions in the contract and to then expect to litigate any alleged breach of contract

claim against the non-Indian in tribal court? This Court determines that, under the circumstances

of this case and on the sole issue currently before this Court, such contract provisions are not

unfair and deceptive when the non-Indian has entered into "consensual relationships [with tribal] members" with a sufficient connection to on-reservation activities to make the consent to jurisdiction and forum selection provisions enforceable under the first Montana exception. See Montana, 450 U.S. at 565. However, in this case, two open issues prompt this Court to deny Defendants' Motion for Partial Summary Judgment: (1) This Court's record lacks information establishing that the Defendants are in fact "members" of the tribe for purposes of the first Montana exception; and (2) an ambiguity in the contract exists as to under what circumstances the non-Indian is consenting to tribal court jurisdiction in addition to binding arbitration.

## I. FACTS

### A. Procedural Facts

Plaintiff Federal Trade Commission ("FTC") filed this action claiming that the above-named Defendants violated provisions of the Federal Trade Commission Act, the Electronic Fund Transfer Act, and rules that the FTC has promulgated. The FTC invoked this Court's jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, as well as under provisions of the Federal Trade Commission Act, 15 U.S.C. §§ 45(m)(1)(A), 45(a), 53(b), 56(a), and 57(b). The FTC filed an Amended Complaint stating seven counts of various alleged unfair and deceptive trade practices and other alleged malfeasances by Defendants in their short-term "pay day" loan offerings and operations. Doc. 44.

Defendants filed a Motion for Partial Summary Judgment, Doc. 52, seeking summary judgment only as to Count VI of the Amended Complaint. The FTC alleged in Count VI that the Defendants "have sued consumers in a distant court that lacks jurisdiction," and that by doing so Defendants have engaged in an unfair act or practice in violation of Section 5 of the Federal

Trade Commission Act. Doc. 44 at 20. The FTC and Defendants submit that there is no genuine issue as to any material fact concerning Count VI and have filed a Joint Stipulation of Material Facts as to which there is no genuine issue to be tried. Doc. 53. The FTC has filed a Statement of Supplemental Material Facts, which Defendants do not contest. Doc. 59.

## B. Undisputed Material Facts

Defendant Martin A. Webb ("Webb") is an enrolled member of the Cheyenne River Sioux Tribe (the "Tribe") and is an "Indian"[1] within the meaning of federal Indian law. Doc. 53 at ¶ 1. Webb is not an official of the Tribe, and Webb does not represent or act on behalf of the Tribe. Doc. 53 at ¶ 1.

Defendants Payday Financial, LLC, Great Sky Finance, LLC, Western Sky Financial, LLC, Red Stone Financial, LLC, Management Systems, LLC, 24-7 Cash Direct, LLC, Red River Ventures, LLC, High Country Ventures, LLC, and Financial Solutions, LLC (collectively the "Companies") are all limited liability companies organized under the laws of the state of South Dakota. Doc. 53 at ¶ 2. Each of the Companies is licensed by the Cheyenne River Sioux Tribe to do business, but none of the Companies act as an agent of the Tribe. Doc. 53 at ¶ 2. All of the Companies are wholly owned by Webb. Doc. 53 at ¶ 2. Webb resides, and the Companies

_____

[1] The word "Indian" has acquired a legal meaning through the course of this nation's history. The origin of the word "Indian" dates back to the mistaken belief of early European explorers in North America that they had encountered people in the East Indies. While it is more appropriate in this era to refer to this nation's indigenous people as Native Americans or American Indians, this Opinion and Order uses the word "Indian" as that is the word used for two centuries in legal opinions to refer to the indigenous population of North America and has come to have a distinct legal meaning. See St. Cloud v. United States, 702 F.Supp. 1456, 1459-61 (D.S.D. 1988) (delineating meaning of "Indian" under laws of United States); see also United States v. Stymiest, 581 F.3d 759, 763-64 (8th Cir. 2009).

are located, within the external boundaries of the Cheyenne River Indian Reservation (the "Reservation"). Doc. 53 at ¶ 3.

The Cheyenne River Indian Reservation is part of what remains of the Great Sioux Reservation, a single reservation created by the 1868 Treaty of Fort Laramie and covering parts of six states. After gold was discovered in the Black Hills of South Dakota and as the cattle market made ranching a feasible way to earn a living from the grasslands of Western South Dakota and contiguous areas, more people of European ancestry moved westward. The Sioux Indians saw their lands shrink and carved into separate reservations leaving them on some of the least desirable lands. In South Dakota, five separate reservations remain of the Great Sioux Reservation—the Pine Ridge Indian Reservation, the Rosebud Sioux Indian Reservation, the Lower Brule Indian Reservation, the Standing Rock Indian Reservation, and the Cheyenne River Indian Reservation. The Dawes Act of 1887, also known as the General Allotment Act, resulted in much of the reservation land becoming privately owned land, thereby creating a "checkerboard" of trust land and private land on the Cheyenne River Indian Reservation and elsewhere. According to the United States Census Bureau, of the poorest eleven counties in the United States based on per capita income, five of them are in South Dakota and correspond with Indian Reservations. Of those, the two counties that comprise the Cheyenne River Indian Reservation—Ziebach County and Dewey County—are the fourth and seventh poorest counties in the United States on a per capita income basis.

Defendants High Country Ventures, LLC, Great Sky Finance, LLC, Payday Financial, LLC, Red River Ventures, LLC, Redstone Financial, LLC, and Western Sky Financial, LLC (collectively the "Lending Companies") made or make short-term loans to borrowers

4

("Borrower" or "Borrowers"). Loans that are involved in this action are made by the Lending Companies. Doc. 53 at ¶ 4. The Lending Companies market loans over the internet and through television advertising designed to reach potential Borrowers who reside off the Reservation and outside of South Dakota. Doc. 53 at ¶ 5. Borrowers are not members of the Tribe. All Borrowers reside off the Reservation and outside of South Dakota. Doc. 53 at ¶ 6. During the entirety of a loan transaction and the entirety of the relationships between Borrowers and the Lending Companies, the Lending Companies and their employees are located within the exterior boundaries of the Reservation, and Borrowers are located off the Reservation and outside of South Dakota. Doc. 53 at ¶ 7.

All communication between the Lending Companies and Borrowers occur via mail, over the telephone, or through the internet. Doc. 53 at ¶ 7. In a typical loan transaction, a potential Borrower contacts a Lending Company over the telephone or the internet to apply for a loan. Doc. 53 at ¶ 7. A potential Borrower sends his or her application and background information to a Lending Company, which then considers the application to determine whether to approve the application. Doc. 53 at ¶ 7. Lending decisions by the Lending Companies are made within the exterior boundaries of the Reservation. Doc. 53 at ¶ 7. Borrowers' decisions are made off the Reservation. The Lending Companies communicate their approval or denial of a loan application to a potential Borrower by telephone or internet. Doc. 53 at ¶ 7. Consumers sign their loan agreements with the Lending Companies electronically. Doc. 59 at ¶ 1.

If a potential Borrower's application is approved and the Borrower accepts the loan, the loan is funded from a bank located within the exterior boundaries of the Reservation, and funds are transferred to the Borrower's bank located off the Reservation. Doc. 53 at ¶ 7. To the extent

5

the Lending Companies make withdrawals from Borrowers' bank accounts for repayment of loans, those withdrawals are initiated from the Lending Companies' bank located within the exterior boundaries of the Reservation, taken from the Borrowers' accounts at banks located off the Reservation, and transferred to the Lending Companies' bank accounts at the Lending Companies' bank located within the exterior boundaries of the Reservation. Doc. 53 at ¶ 7.

If Borrowers miss payments or fail to repay their loans, the Lending Companies, in some instances, initiate collection procedures. Decisions to initiate collection efforts are made by the Lending Companies within the exterior boundaries of the Reservation. Doc. 53 at ¶ 7. As part of their collection efforts, the Lending Companies sometimes file collection lawsuits against consumers in the Cheyenne River Sioux Tribal Court, which is located on the Reservation. Doc. 59 at ¶ 2.

The loan agreements entered into between the Lending Companies and Borrowers include provisions stating that the Tribal Court has exclusive jurisdiction over enforcement actions. Doc. 53 at ¶ 8. A typical loan agreement provides:

> This Loan Contract is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation. By executing this Loan Contract, you, the borrower, hereby acknowledge and consent to be bound to the terms of the Loan Contract, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and further agree that no other state or federal law[2] or regulation shall apply to this Loan Contract, its enforcement or interpretation.
>
> . . .

---

[2] The Lending Companies of course cannot disclaim any applicable federal law and do not contest the authority of the FTC to bring this action alleging unfair and deceptive trade practices contrary to federal law.

6

> You . . . expressly agree to the sole application of the Indian
> Commerce Clause[3] of the U.S. Constitution and the laws of the
> Cheyenne River Sioux Tribe regarding this Agreement and the
> potential garnishment of wages, and the sole jurisdiction of the
> Cheyenne River Sioux Tribal Court regarding any and all matters
> arising therefrom.

Doc. 53 at ¶ 9.

However, other provisions of the typical loan agreement contain language that requires

binding arbitration of any dispute. The typical loan contract, for instance, provides:

> 3. Except as provided in Paragraph 6[4] below, you agree that all
> disputes including any Representative Claims against us and/or
> related third parties shall be resolved by binding arbitration only.
>
> . . .
>
> 4. . . . Arbitration shall be conducted in the Cheyenne River
> Sioux Tribal Nation by an authorized representative in accordance
> with its consumer dispute rules[5] and the terms of this Waiver of
> Jury Trial and Arbitration Provision. You may appear at
> arbitration via telephone or video conference, and you will not be
> required to travel to the Cheyenne River Sioux Tribal Nation . .
> . .

---

[3] The "Indian Commerce Clause" refers to part of the Commerce Clause, which states that Congress shall have the power "[t]o regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Thus, the "Indian Commerce Clause" provides for federal authority, exclusive of the states, in dealings with Indian tribes, Worchester v. Georgia, 31 U.S. (6 Pet.) 515, 561 (1832), but does not provide a basis for tribal jurisdiction over non-Indians.

[4] Paragraph 6 states in full: "This Arbitration Provision is made pursuant to a transaction involving the Indian Commerce Clause of the Constitution of the United States of America, and shall be solely governed by the law of the Cheyenne River Sioux Tribe." This language does not except anything from the binding arbitration clause and, as explained in footnote 3, contains a misunderstanding of the Indian Commerce Clause.

[5] Any "consumer dispute rules" of the Tribe have not been filed as a part of the record in this case.

7

Doc. 10 at 16, 59-60, 81, 104, 117, 136. At oral argument, the FTC acknowledged that it does not challenge the enforceability of the arbitration clause, but only the enforceability of the provision by which non-Indian Borrowers "consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court." Doc. 82 at 51, 56-57. Both the language of the typical loan agreement and the statements of counsel at the hearing left this Court confused as to whether the tribal court actions that Defendants have started against Borrowers are supposed to be arbitrations using a tribal court judge or are tribal court suits independent from the arbitration provision of the typical loan agreement. Doc. 82 at 26-28, 34, 50-57, 65.

## II. DISCUSSION

### A. Tribal Jurisdiction over Nonmembers Through Montana

The Supreme Court long has recognized Indian tribes as "distinct, independent political communities." Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 559 (1832). Indian tribes retain a sovereignty of "a unique and limited character," United States v. Wheeler, 435 U.S. 313, 322-23 (1978), including, but not limited to, self-governance over tribal members within the boundaries of the tribes' reservation lands. United States v. Mazurie, 419 U.S. 544, 557 (1975). After all, tribes had dominion over this Continent prior to settlement of Europeans and expansion of these settlements. When a tribe's jurisdiction "is not specifically authorized by federal statute or treaty, a tribe's adjudicatory authority must stem from its 'retained or inherent sovereignty.'" Attorney's Process & Investigation Serv., Inc. v. Sac & Fox Tribe, 609 F.3d 927, 934 (8th Cir. 2010) (hereinafter "Attorney's Process One") (quoting Atkinson Trading Co., Inc. v. Shirley, 532 U.S. 645, 649-50 (2001)). The extent to which tribes retain or possess adjudicatory authority has been defined primarily by judicial decisions. Id. (citing Felix Cohen, Cohen's Handbook of Federal

8

Indian Law, § 7.01 (5th ed. 2005)). "Whether a tribal court has authority to adjudicate claims against a nonmember is a federal question within the jurisdiction of the federal courts." Id.

Indian tribes generally lack legal authority over people who are not tribal members. Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 328 (2008). The decision that the Supreme Court has described as "pathmarking" in defining tribal legal authority over non-Indians is Montana v. United States, 450 U.S. 544 (1981). See Strate, 520 U.S. at 445. In Montana, the Supreme Court recognized that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." Montana, 450 U.S. at 565. The Court in Montana then recognized two exceptions to this general principle under which tribes may exercise "civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." Id.; see also Plains Commerce Bank, 554 U.S. at 329. Because Montana involved a question of the extent of tribal regulatory authority, the Court in Montana phrased the two exceptions as follows:

> A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

Montana, 450 U.S. at 565-66 (internal citations omitted).

The Supreme Court has employed the Montana exceptions in determining whether a tribal court has adjudicatory jurisdiction over non-Indians. See Strate, 520 U.S. at 438. In Strate, a case involving the jurisdiction of a tribal court over personal injury actions against non-Indian

9

defendants, the Court summarized the principles of the <u>Montana</u> decision as they relate to tribal court jurisdiction as follows:

> <u>Montana</u> thus described a general rule that, absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation, subject to two exceptions: The first exception relates to nonmembers who enter consensual relationships with the tribe or its members; the second concerns activity that directly affects the tribe's political integrity, economic security, health, or welfare.

<u>Id.</u> at 446. "'If the Tribe retains the power under <u>Montana</u> to regulate [nonmember] conduct,' it makes no 'difference whether it does so through precisely tailored regulations or through' litigation in tribal court." <u>Fox Drywall & Plastering, Inc. v. Sioux Falls Const. Co.</u>, No. 12-4026, 2012 WL 1457183, at *7 (D.S.D. April 26, 2012) (quoting <u>Attorneys Process One</u>, 609 F.3d at 938).

### B. Effect of <u>Plains Commerce Bank</u> Decision

In 2008, the Supreme Court in <u>Plains Commerce Bank</u>, 554 U.S. 316, considered the <u>Montana</u> exceptions in a case involving, somewhat coincidentally,[6] the Cheyenne River Sioux Tribal Court's civil jurisdiction over a nonmember. In <u>Plains Commerce Bank</u>, an off-reservation bank had entered into contractual and lending relationships with the Long family, some of whom were tribal members, and with a South Dakota corporation formed by Long family members to facilitate their ranching operations. <u>Id.</u> at 321. After the Longs and their company defaulted on certain loan obligations, the bank received deed to non-trust land previously owned by the Longs

---

[6] The Cheyenne River Indian Reservation is the fourth largest Indian reservation in the United States with a total land area of approximately 4,267 square miles, so it is only somewhat of a coincidence that both the <u>Plains Commerce Bank</u> case and this case involve issues of the Cheyenne River Sioux Tribal Court.

within the exterior boundaries of the reservation.[7] Id. The bank leased the land back to the Longs, giving them an option to purchase the land, but the Longs could not make lease payments due to financial stress and a large death loss of cattle in a brutal winter. Id. at 321-22. The bank later sold the land to non-Indian purchasers. Id. at 322. The Longs then sued the bank in tribal court for breach of contracts, discrimination, and other claims. Id. The bank contested jurisdiction in tribal court, but the tribal court found that it had jurisdiction. A jury trial in tribal court resulted in a jury verdict for the Longs on three claims, including a common law claim of "discrimination," and a general damage award of $750,000.00. Id. at 322-23. The tribal court then, as part of granting equitable relief on the discrimination claim, nullified the bank's sale of the land at issue to the non-Indian purchasers. Id. at 323.

The bank in Plains Commerce Bank chose to appeal just on the discrimination claim, in a case that went through tribal appellate court, into federal court in this district, and ultimately to the Supreme Court. Id. All nine members of the Supreme Court agreed that the tribe's jurisdiction did not extend to nullifying a sale of non-trust land between the bank and non-tribal members. See id. at 342 (Ginsburg, J., dissenting) (expressing that the minority agreed with the majority opinion that the tribal court lacked authority to nullify sale). The Court split, however, 5-to-4 on other matters. The majority opinion in Plains Commerce Bank contemplated that the consequence of the decision, cognizant that the bank had not appealed from tribal court jurisdiction over breach of contract or contractual bad faith claims, was "vacatur of the general damages award, vacatur of the option to purchase, [and/or] a new trial on the other claims." Id.

---

[7] As noted previously, the Cheyenne River Indian Reservation is a "checkerboard" of land where much of the land is held in trust by the United States but where many other tracts of land are now privately owned. The land at issue in Plains Commerce Bank was privately owned.

at 327; see also Plains Commerce Bank v. Long Family Land & Cattle Co., No. 12-3021-RAL, 2012 WL 6731812, at *5-8 (D.S.D. Dec. 28, 2012) (noting that the bank in Plains Commerce Bank only appealed the discrimination claim and the Supreme Court anticipated further proceedings on the claims not appealed).

The Court in Plains Commerce Bank relied on the language in Montana and appeared not to have intended to enlarge or restrict the Montana exceptions. The Court in Plains Commerce Bank noted that the Montana exceptions, by their terms, concerned either "the *activities* of nonmembers" or "the *conduct* of non-Indians on fee land." Id. at 330 (emphasis in original) (internal quotation marks omitted). Language used by the Court in Plains Commerce Bank considered application of the Montana exceptions in the context of actions by the nonmember bank on non-trust land within a reservation. The Court reasoned that tribal jurisdiction "may be fairly imposed on nonmembers only if the nonmember has consented, either expressly or by his actions. Even then, the regulation must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self government, or control internal relations." Id. at 337 (citing Montana, 450 U.S. at 564).

The majority opinion in Plains Commerce Bank contains language that is difficult to reconcile at times, both internally and with the Supreme Court's prior jurisprudence. On the one hand, the majority opinion could be read to introduce a concept of foreseeability into determining tribal civil jurisdiction over nonmembers. In addressing the off-reservation bank's consensual entry into commercial dealings with a ranching family that included tribal members, the Supreme Court stated:

12

> The Bank may reasonably have anticipated that its various commercial dealings with the Longs could trigger tribal authority to regulate those transactions—a question we need not and do not decide. But there is no reason the Bank should have anticipated that its general business dealings with respondents would permit the Tribe to regulate the Bank's sale of land it owned in fee simple.

Id. at 338. On the other hand, the majority opinion in Plains Commerce Bank seemed to tether both Montana exceptions to the nonmember's conduct on tribal land. Id. at 333. That is, the Supreme Court in Plains Commerce Bank reviewed its jurisprudence to note "only 'one minor exception [where the Court has] upheld under Montana the extension of tribal civil authority over nonmembers on non-Indian land.'" Id. at 333 (quoting Nevada v. Hicks, 533 U.S. 353, 360 (2001)). That exception was in Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation, 492 U.S. 408 (1989), where the Supreme Court upheld a tribe's power to restrain particular uses of non-Indian fee land on the reservation through zoning regulations. Id. at 440-41, 443-44. However, elsewhere in its jurisprudence, the Supreme Court has authorized tribal court jurisdiction over nonmembers who derive benefits from their conduct on the reservation. For instance, a contract dispute over the sale of merchandise by a non-Indian to an Indian on a reservation may be subject to tribal jurisdiction, Williams v. Lee, 358 U.S. 217, 223 (1959), and a tribe has the authority to tax a non-Indian business mining on a reservation, Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 141 (1982). The Supreme Court previously has stated that "[t]ribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty" and "[c]ivil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." Iowa Mutual Ins. Co. v. LaPlante, 480 U.S. 9, 18 (1987).

13

The decision in <u>Plains Commerce Bank</u> cannot be read to enlarge tribal court jurisdiction over non-Indians.[8] Yet, the majority decision in <u>Plains Commerce Bank</u> likewise cannot be read to overrule any prior decision or to abrogate the <u>Montana</u> exceptions. Federal court decisions post-dating <u>Plains Commerce Bank</u> generally apply the same analysis under <u>Montana</u>, suggestive that <u>Plains Commerce Bank</u> has not been taken as a narrowing of the <u>Montana</u> exceptions. See e.g., <u>Dish Network Serv. LLC v. Laducer</u>, No. 4:12-CV-058, 2012 WL 2782585, at *4-5 (D.N.D. July 9, 2012) (applying <u>Montana</u> in determining off-reservation business entering into consensual relationship with tribal member to provide services on reservation was subject to tribal court jurisdiction).

After the <u>Plains Commerce Bank</u> decision, the Eighth Circuit harkened back to an observation by Justice Souter that tribal authority over nonmembers remained "ill-defined." <u>Attorney's Process One</u>, 609 F.3d at 934 (citing <u>Hicks</u>, 533 U.S. at 376 (2001) (Souter, J., concurring)). The Eighth Circuit then observed:

---

[8] Indeed, academics who endorse a broader view of tribal court jurisdiction have excoriated the majority opinion in <u>Plains Commerce Bank</u>. See Frank Pommersheim, <u>Plains Commerce Bank v. Long Family Land and Cattle Company, Inc.: An Introduction with Questions</u>, 54 S.D. L. Rev. 365, 373-74 (2009) ("In sum, the Court created a very narrow rule to answer a question that was not asked, showed consummate indifference, if not hostility, to the quality of tribal court decision making, and left the parties with no guidance in resolving the enforcement of the jury verdict in this case. The Court, it would seem, remains adrift from both law and equity, as well as the reality of economic development in Indian country, which requires certainty, predictability, and respect for tribal institutions."); Katherine J. Florey, <u>Indian Country's Borders: Territoriality, Immunity, and the Construction of Tribal Sovereignty</u>, 51 B.C. L. Rev. 595, 613 (2010) (noting that the Court's recent line of cases up to and including <u>Plains Commerce Bank</u> "have raised the specter that, even as the Supreme Court has disclaimed any such intention, it increasingly treats tribes as something more akin to 'private voluntary organizations'—or, as Philip Frickey has put it, 'ethnocentric Elks Clubs'—than to autonomous sovereigns still possessing most of their historical powers") (internal citations omitted).

14

> The controlling principle[s] [of tribal civil authority over nonmembers] are broad and abstract and must be carefully applied to the myriad disparate factual scenarios they govern. Determining the contours of tribal civil jurisdiction and the boundaries of tribal sovereignty requires consideration of the historical scope of tribal sovereignty and the evolving place of the tribes within the American constitutional order, careful study of precedent, and ultimately a "proper balancing" of the conflicting interests of the tribes and nonmembers.

Id. (citing Hicks, 533 U.S. at 374).

### C. Analysis of Tribal Court Jurisdiction over these Borrowers

The Supreme Court never has addressed the issue of tribal court jurisdiction over a non-Indian when the non-Indian enters into a written contract containing clauses that select the tribal court as the forum for all disputes and by which the non-Indian consents to tribal court jurisdiction. Under the language of the first Montana exception, the tribal court would have jurisdiction based on "the activities of nonmembers who enter into consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." Montana, 450 U.S. at 565. When a nonmember enters into a commercial transaction with a tribal member or reservation-based tribal business, receives a benefit coming from the reservation as a result, and consents in a written contract to tribal jurisdiction, that nonmember seems to have engaged in the sort of "consensual relationship with the tribe or its members, through commercial dealing" that would subject the nonmember to tribal jurisdiction. Id.

The problem in applying this principle to this case, however, is twofold. First, the Montana exception at issue concerns consensual relationships "with the tribe or its members." Id. The Lending Companies here are all limited liability companies organized under the laws of the state of South Dakota. Although each company is licensed with the Cheyenne River Sioux

Tribe to do business and is owned by tribal member Martin Webb, the fact remains that these are South Dakota limited liability companies. As such, for purposes such as diversity jurisdiction, they are deemed citizens of the state of South Dakota. See e.g., 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of every State . . . by which it has been incorporated and of the State . . . where it has its principal place of business."); Lincoln Prop. Co. v. Roche, 546 U.S. 81, 88-89 (2005) (noting that a corporation is a citizen of the state where it is chartered and where its principal place of business is located). The record is devoid at this time of information as to what it means for a business to be "licensed" by the Cheyenne River Sioux Tribe. The South Dakota limited liability companies are a distinct entity from their owner Webb. See Brevet Int'l, Inc. v. Great Plains Luggage Co., 2000 S.D. 5, ¶ 25, 604 N.W.2d 268, 273 ("We have long recognized that, as a general rule, a corporation is to be considered a legal entity separate and distinct from its shareholders, officers and directors unless and until there is sufficient reason to the contrary."); Kansas Gas & Elec. Co. v. Ross, 521 N.W.2d 107, 111 (S.D. 1994) ("A firmly entrenched doctrine of American law is the concept that a corporation is considered a legal entity separate and distinct from its officers, directors and shareholders . . . .").

At this time, this Court cannot determine that the South Dakota limited liability companies listed as Defendants are "members" of the Tribe for purposes of the first Montana exception. Therefore, summary judgment is not warranted based on the consensual relationship exception because Defendants have failed to meet their burden to show that the Lending Companies are tribal members.

The second problem in applying the Montana exception in this case relates to whether the nonmember off-reservation Borrowers are engaging in on-reservation activities or conduct

16

through obtaining a benefit from the reservation and thus could foresee—or as the Supreme Court in Plains Commerce Bank put it "may reasonably have anticipated"—that the Borrowers' dealings could trigger tribal authority over them. See Plains Commerce Bank, 554 U.S. at 338. The FTC contends that the Supreme Court and Eighth Circuit require that in order for tribal courts to have jurisdiction under Montana, the nonmember's conduct giving rise to the claim must occur *physically* on or within the reservation. Doc. 58 at 7 (emphasis added). Defendants concede that the Borrowers are physically located outside the reservation, but argue that the lending contracts are formed on the reservation and that the Borrowers' course of conduct related to the contract is sufficiently connected to the reservation to satisfy the "on the reservation" requirement. Doc. 60 at 4-5, 9-10.

Montana's first exception does not textually include a requirement that the consensual relationship be formed inside the reservation. See Montana, 450 U.S. at 565 ("A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.") But the Supreme Court in Montana prefaced both exceptions by stating that "tribes retain inherent sovereign authority to exercise some forms of civil jurisdiction over nonmembers *on their reservations*, even on non-Indian fee lands." Id. (emphasis added). In Plains Commerce Bank, the Supreme Court stated that "Montana and its progeny permit tribal regulation of nonmember *conduct inside the reservation* that implicates the tribe's sovereign interests." 554 U.S. at 332 (emphasis added). The Supreme Court also noted that tribal jurisdiction under the first Montana exception has occurred only when the issue involves "regulation of non-Indian activities *on the reservation* that had a discernable effect on

17

the tribe or its members." Id. (emphasis added); see also Hornell Brewing Co. v. Rosebud Sioux Tribal Court, 133 F.3d 1087, 1091 (8th Cir.1998) (holding that "[n]either Montana nor its progeny purports to allow Indian tribes to exercise civil jurisdiction over the activities or conduct of non-Indians occurring *outside their reservations*") (emphasis in original).

"The starting point" for an analysis of whether a tribe may maintain jurisdiction under Montana is "to examine the specific conduct the . . . claims seek to regulate." Attorney's Process One, 609 F.3d at 937. "The Montana exceptions focus on 'the activities of nonmembers' or 'the conduct of non-Indians.'" Id. (quoting Plains Commerce Bank, 554 U.S. at 329-30). Ultimately, to sustain tribal court jurisdiction, the tribe or tribal member must show that the activities or conduct it seeks to regulate through adjudication occurred "inside the reservation." See id. at 940.

Here, the contract between the Borrowers and Lending Companies appears to be formed on the Reservation in South Dakota. "The test of the place of a contract is the place where the last act is done by either of the parties which is necessary to complete the contract and give it validity." O'Neill Farms, Inc. v. Reinert, 2010 S.D. 25, ¶ 12, 780 N.W.2d 55, 59 (quoting Briggs v. United Servs. Life Ins. Co., 117 N.W.2d 804, 807 (S.D. 1962)); see also 2 Williston on Contracts § 6:62 (4th ed.) ("[T]he general principle applicable to this and any similar question is that the place of the contract is the place where the last act necessary to the completion of the contract was done."). The Joint Stipulation of Material Facts indicates that the last act necessary to contract formation appears to be one done on the Reservation by a Lending Company:

> c.     A potential Borrower sends his or her application and
>        background information to a Lending Company, which

18

> then considers the application to determine whether to approve the application.

d. Lending decisions by the Lending Companies are made within the exterior boundaries of the Reservation.

e. Borrowers' decisions are made off the Reservation.

f. The approval or denial of a loan application is communicated to a potential Borrower over the telephone or the Internet. A potential borrower sends the application to a Lending Company located on the Reservation to determine if it will accept the application.

Doc. 53 at 3. Where the contract was formed is only part of the analysis concerning the nonmember's overall conduct on the reservation. The Borrowers' conduct directed toward the Reservation includes applying to a reservation-based business for a loan, agreeing with the reservation-based business to a loan, and receiving of funds from a reservation business under a loan contract.

Yet, the FTC argues that the physical "location of the nonmember's activity is dispositive." Doc. 58. None of the cases the FTC cited to involve claims that arose from an arms-length contractual relationship between a tribal member and a non-Indian. The case closest in facts is, not surprisingly, from this District.[9] In Christian Children's Fund, Inc. v. Crow Creek Sioux Tribal Court, 103 F. Supp. 2d 1161 (D.S.D. 2000), a national non-profit based in

_____

[9] Issues concerning tribal court jurisdiction are recurrent in the District of South Dakota. Since the Supreme Court decision in Plains Commerce Bank, the Indian law decisions from this District include: Plains Commerce Bank, 2012 WL 6731812; J.L. Ward Associates, Inc. v. Great Plains Tribal Chairmen's Health Bd., 842 F. Supp. 2d 1163 (D.S.D. 2012); Fox Drywall, 2012 WL 1457183; United States v. Lopez, No. 11-50073, 2012 WL 6629595 (D.S.D. Dec. 19, 2012); Colombe v. Rosebud Sioux Tribe, 835 F. Supp. 2d 736 (D.S.D. 2011); Different Horse v. Salazar, No. 09-4049, 2011 WL 3422842 (D.S.D. Aug. 4, 2011); Sprint Communications Co., L.P. v. Native Am. Telecom, LLC, No. 10-4110, 2010 WL 4973319 (D.S.D. Dec. 1, 2010).

Virginia that had agreed to provide funding to the Hunkpati Project Advisory Council ("Hunkpati") so Hunkpati could administer programs for needy children on the Crow Creek Sioux Indian Reservation, withdrew its sponsor funding pursuant to the parties' agreement. Id. at 1162. Hunkpati sued in Crow Creek Sioux Tribal Court, but a federal court held that the tribal court lacked jurisdiction because the "alleged conduct which forms the basis for the complaints ... did not occur within the Reservation." Id. at 1166. The nonmember defendant's agreement with Hunkpati did not specify tribal court jurisdiction, Hunkpati was not a tribal member or registered by the tribe and did not have tribal members as leaders, and the bank the parties used to transfer funds was located off the reservation. Id. at 1162, 1166. Also, the national non-profit's decision to terminate its sponsorship did not require consultation or contact with Hunkpati and "[a]ll decisions and related actions regarding the termination . . . were made and implemented off the reservation." Id. at 1166. By contrast, the Defendants make their lending decisions on the Reservation, the loan contract forms on the Reservation, money is transferred from a bank on the Reservation, and the contract specified tribal jurisdiction, albeit with provisions that also specify binding arbitration only and do not reconcile those provisions. See also Dish Network, 2012 WL 2782585, at *5 (holding that the consensual relationship exception may give a tribal court jurisdiction over a non-Indian, off-reservation company when the claim requires an examination of a contract the company entered into with a tribal member to provide services on the reservation).

In many cases, a nonmember defendant's lack of physical contact with the reservation, particularly in tort cases, is indicative that the nonmember's conduct did not occur within the reservation and did not have a discernable effect on the tribe. See e.g., Hornell Brewing, 133

20

F.3d at 1093 (holding that tribal court lacked jurisdiction over tort claims challenging an off-reservation brewery's manufacture, sale, and distribution of "The Original Crazy Horse Malt Liquor" because the brewery did not manufacture, sell, or distribute on the reservation and general advertisements outside the reservation and on the internet did not directly affect the Tribe's health and welfare); Attorney's Process One, 609 F.3d at 930 (holding that the tribe lacked jurisdiction over a tort claim when the tribe could not meet its burden to show that the conduct that the tort claim sought to regulate occurred on the reservation). But, in cases involving a contract formed on the reservation in which the parties agree to tribal jurisdiction, treating the nonmember's physical presence as determinative ignores the realities of our modern world that a defendant, through the internet or phone, can conduct business on the reservation and can affect the Tribe and tribal members without physically entering the reservation. The proper focus is on the nonmember Borrower's "'*activities*'" or "'*conduct*,'" Attorney's Process One, 609 F.3d at 937 (quoting Plains Commerce Bank, 554 U.S. at 329-330), not solely the nonmember Borrower's *physical location*. Under the FTC's presence-based analysis, a tribal court would have jurisdiction if a Borrower traveled to the Reservation to do any of the steps to obtain a loan from a Lending Company. But, if the Borrower stays home and undertakes the same steps by phone or internet to obtain the same loan, according to the FTC, the tribal court can never have jurisdiction. Those contracts, however, have the same effect on the nonmember, the tribe, the lender, and the reservation. Reducing the Montana jurisdictional analysis from a thorough investigation of the nonmember's course of conduct and contact with the reservation, to a mere determination of the nonmember's physical location is improper and would render Montana's jurisdictional inquiry inapplicable to many modern-day contracts involving a

reservation-based business. See Attorney's Process One, 609 F.3d at 934 (citing Hicks, 533 U.S. at 376 (2001) (Souter, J., concurring)) ("The controlling principle[s] [of tribal civil authority over nonmembers] are broad and abstract and must be carefully applied to the myriad disparate factual scenarios they govern. Determining the contours of tribal civil jurisdiction and the boundaries of tribal sovereignty requires consideration of the historical scope of tribal sovereignty and the evolving place of the tribes within the American constitutional order, careful study of precedent, and ultimately a 'proper balancing' of the conflicting interests of the tribes and nonmembers.").

This does not end the analysis, however, of whether the Borrowers engaged in on-reservation conduct sufficient to justify and foresee tribal court jurisdiction over them. The typical loan agreement states that the lending company is "a lender organized under and authorized by the laws of Cheyenne River Sioux Tribe and Indian Commerce Clause of the Constitution of the United States of America." However, the "Indian Commerce Clause" is a grant of Constitutional authority to Congress, and not to any private entity or tribe. Const. Art. I, Sect. 8, Clause 3; see supra footnote 3. And the settled facts establish that each lending company is a limited liability company organized under South Dakota law and thus apparently not "organized under . . . the laws of Cheyenne River Sioux Tribe" as the contracts purport. The typical loan contract contains a series of provisions that require arbitration in "the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules." See e.g., Doc. 10 at 16. Yet, the typical loan contract elsewhere states that Borrowers "consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court." See e.g., Doc. 10 at 16. The loan contract thus leaves it unclear whether a dispute is resolved exclusively through arbitration that would take place on the Reservation,

22

or through the exclusive jurisdiction of the tribal court, or through some hybrid of a tribal court proceeding characterized as an arbitration. Although the Borrower could foresee that contractual benefits were coming from the Cheyenne River Indian Reservation, the Borrower could not foresee with clarity whether the Borrower had acceded only to binding arbitration on the Reservation, to the exclusive jurisdiction of the tribal court, or, as the Lending Companies tried to reconcile these provisions, a bit of both arbitration and tribal court proceedings at the discretion of the Lending Companies. See Doc. 82 at 26-28, 34, 50-57, 65.

There have been two other federal courts that have addressed the enforceability of these provisions of the Defendants' typical loan agreement. In a suit brought by a Borrower, the United States District Court for the Northern District of Illinois in Jackson v. Payday Financial LLC, No. 11C9288, 2012 WL 2722024 (N.D. Ill. July 9, 2012), granted a motion to dismiss filed by Payday Financial LLC based on the portion of the loan agreement that provided for resolution of disputes "by arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative . . . ." Id. at *2-4. Such a decision is consistent with the Federal Arbitration Act and the strong federal policy favoring enforcement of arbitration provisions. 9 U.S.C. § 1 et seq; Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). The decision in Jackson also is consistent with cases that generally enforce arbitration provisions and the venue selected in arbitration provisions, even in the context of internet short-term loan contracts. See, e.g., Alfeche v. Cash Am. Int'l, Inc., No. 09-0953, 2011 WL 3565078, at *5 (E.D. Pa. Aug. 12, 2011). Indeed, the FTC has raised no issue with the enforceability of the arbitration provision or of requiring arbitration on the reservation. Doc. 82 at 51, 56-57.

The other federal court decision involving the loan agreement used by the Lending

Companies is Colorado v. Western Sky Financial LLC, 845 F. Supp. 2d 1178 (D. Colo. 2011).

In that case, the United States District Court for the District of Colorado refused to enforce the

provision in the loan agreement that subjected the contract "solely to the exclusive laws and

jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation." Id. at

1180. The District of Colorado, looking exclusively at the Borrower's side of the transaction,

reasoned:

> The borrowers do not go to the reservation in South Dakota to
> apply for, negotiate or enter into loans. They apply for loans in
> Colorado by accessing defendants' website. They repay the loans
> and pay the financing charges from Colorado; Western Sky is
> authorized to withdraw the funds electronically from their bank
> accounts. The impact of the allegedly excessive charges was felt
> in Colorado. Defendants have not denied that they were doing
> business in Colorado for jurisdictional purposes, nor does it
> appear that they could.

Id. at 1181. This passage from the opinion reveals that the District of Colorado considered only

one side of a two-sided transaction, the opposite side of which could be summarized as the

following:

> The Lending Companies do not leave their reservation in South
> Dakota as a part of the transaction. Rather, the Borrower applies
> online to Lending Companies by electronically transmitting their
> application to the reservation in South Dakota. The Lending
> Companies assess on the reservation in South Dakota whether the
> Borrowers should receive a loan. The contract apparently forms
> on the reservation in South Dakota when the Lending Companies
> accept a Borrower's application. The Lending Companies
> advance funds from a bank on the reservation in South Dakota
> and any funds are transferred electronically from there. The
> impact of any default by the Borrower is felt on the reservation in
> South Dakota. The Borrower enters into a contract that contains

24

> a consent to resolution of any dispute on the reservation and
> selects the application of tribal law to govern any dispute.

In fairness, both sides of the transaction must be considered. If there were no written contract at all in such a lending transaction between a borrower in one state and a lender in another, then jurisdiction might exist in either state, and the court would be applying choice of law principles that might well result in application of the law from the lender's jurisdiction. See e.g., Drinkall v. Used Car Rentals, Inc., 32 F.3d 329, 331 (8th Cir. 1994) ("A district court, sitting in diversity, must follow the choice-of-law approach prevailing in the state in which it sits."); Burhenn v. Dennis Supply Co., 2004 S.D. 91, ¶ 24, 685 N.W.2d 778, 784 (noting that South Dakota applies the multi-factor most significant relationship test to determine choice of law issues). If a written contract in such a transaction specified that the law of the lender's state governed and that courts in the lender's home state had exclusive jurisdiction, a court would enforce those provisions. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 n.14 (1985) (noting that where "forum selection provisions were obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust'" they will be enforced) (quoting The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972)); M.B. Rests., Inc. v. CKE Rests., Inc., 183 F.3d 750, 751 (8th Cir. 1999) (upholding a forum selection clause in a franchising agreement directing litigation to Utah, which was the state where the franchisor was headquartered, even if there is some inconvenience to a party); Aetna Life Ins. Co. v. Great Nat. Corp., 818 F.2d 19, 20 (8th Cir. 1987) (holding choice of law provisions specifying that contract was governed by lender's preferred state was valid and enforceable). Thus, if the forum selection clause is valid, it ought to be enforced even though a borrower may do little in the lender's home jurisdiction. Indeed, courts in this country

generally enforce forum selections clauses, even in situations where the forum selected is a foreign country, if the United States citizen has entered into a contract to receive a benefit from a foreign country. See e.g., The Bremen, 407 U.S. at 9-12; Holland Am. Line, Inc. v. Wartsila N. Am., Inc., 485 F.3d 450, 457 (9th Cir. 2007). It would be paradoxical if courts would be more inclined to enforce a forum selection clause specifying a foreign nation's courts than to enforce a forum selection clause specifying tribal court jurisdiction. After all, Congress has "consistently encouraged" the development of tribal courts as part of its efforts to foster tribal self-governance.[10] Iowa Mut. Ins. Co., 480 U.S. at 14-15; Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 856 (1985); Plains Commerce Bank, 2012 WL 6731812, at *4.

The difference between the decision in the Northern District of Illinois enforcing the Lending Companies' binding arbitration language and the decision in the District of Colorado refusing to enforce the Lending Companies' exclusive tribal jurisdiction language is revealing. Because of the Federal Arbitration Act, 9 U.S.C. § 1 et seq, arbitration provisions, including a choice of venue for the arbitration, are routinely enforceable. Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25. The FTC does not challenge enforceability or fairness of the requirement that binding arbitration take place on the Cheyenne River Indian Reservation. Doc. 82 at 51, 56-57. Yet, the FTC has arguments to challenge selection of the tribal court for any litigation because of the limited nature of tribal court jurisdiction over non-Indians and because tribal courts are

---

[10] Congress recently took steps to enlarge tribal court jurisdiction over nonmembers. In the re-authorization of the Violence Against Women Act, Congress extended tribal court criminal jurisdiction over nonmembers who assault their Indian spouses within Indian country. See Violence Against Women Reauthorization Act of 2013, S. 47, 113th Cong. § 904 (2013) (enacted); see also Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 212 (1978) (holding that tribal courts do not have criminal jurisdiction over non-Indians absent affirmative congressional authorization).

not courts of general jurisdiction in the same sense as state courts. <u>See</u> <u>Hicks</u>, 533 U.S. at 367. Because of the Federal Arbitration Act and the absence of any concomitant legislation enlarging tribal court jurisdiction, the ability of the Lending Companies to specify and enforce arbitration as a mode of dispute resolution on the reservation encounters fewer obstacles than the attempt to specify tribal court jurisdiction. By no means does this reflect a judgment that arbitration is somehow superior to tribal court jurisdiction; indeed, the Cheyenne River Sioux Tribe has an appellate court and provides more procedural safeguards in litigation than would many arbitration tribunals.

Ultimately, the inconsistencies in the language of the lending agreement and the question about whether the Lending Companies can be considered tribal "members" under the <u>Montana</u> exception make it inappropriate to grant Defendants' Motion for Partial Summary Judgment as to Count VI. A lending agreement involving a tribal "member" and having different language—rather than specifying both exclusive tribal court jurisdiction and exclusive dispute resolution through separate arbitration without reconciling those provisions—may be enforceable. This lending contract leaves Borrowers lacking the requisite foreseeability that there will be tribal court jurisdiction—as opposed to arbitration on the Reservation—and undercuts the clarity of the consent of the non-Indian Borrowers to tribal court jurisdiction as a part of a consensual arrangement where Borrowers understand that they are entering into a transaction on an Indian reservation to receive a benefit from an Indian reservation and a tribal member.

## III. CONCLUSION

For the reasons contained herein, it is hereby

27

ORDERED that the Defendants' Motion for Partial Summary Judgment, Doc. 52, is denied.

Dated March **28**, 2013.

BY THE COURT:

Robert A. Lange

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE