UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

FILED

SEP 3 0 2013

_____ CLERK

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | * | CIV 11-3017-RAL |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | OPINION AND ORDER |
| | * | GRANTING IN PART AND |
| PAYDAY FINANCIAL LLC, et al., | * | DENYING IN PART |
| | * | PLAINTIFF'S MOTION FOR |
| Defendants. | * | SUMMARY JUDGMENT |
| | * | |

## I. Introduction.

Plaintiff Federal Trade Commission ("FTC") filed this action invoking federal court jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, as well as under provisions of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and 57(b). There is no question about this Court's jurisdiction or venue.

The FTC filed an Amended Complaint, Doc. 44, setting forth seven separate counts, five of which—Counts I, II, III, VI, and VII—allege violations of § 5 of the FTCA, while the remaining two counts allege violations of the Credit Practices Rule and the Electronic Fund Transfer Act ("EFTA") and Regulation E. The FTC has sued ten Defendants, asserting that the Defendants have operated as a common enterprise controlled by Defendant Martin A. Webb. The FTC through much of its pleadings refer to the Defendants collectively, seeking to hold all of the Defendants responsible for alleged violations of the FTCA, the Credit Practices Rule, and the EFTA. The Defendants dispute that they constitute a common enterprise or have violated any law.

The FTC filed a Motion for Summary Judgment on all of its counts, except for Count II. Doc. 93. The FTC sought through the summary judgment filing a final judgment and order for

permanent injunctive and monetary relief. The FTC requests judgment against the Defendants, jointly and severally for $417,740—the total profit Defendants received through what the FTC views as illegally garnished consumer wages—plus a civil monetary penalty of $3.8 million on the various claims. The FTC proposed a final judgment and order for permanent injunction and monetary relief, Doc. 100, that is twenty-five pages in length. The Defendants contest the FTC's entitlement to summary judgment and dispute the damages claimed and the injunctive relief sought.

The parties have submitted a number of pleadings setting forth what they contend the facts to be. The FTC filed a Statement of Undisputed Material Facts and supporting material consistent with Rule 56 of the Federal Rules of Civil Procedure and this District's Local Civil Rule 56.1. Docs. 95, 96, 97, 98, 99; D.S.D. Civ. LR 56.1. The Defendants filed a response disputing some of the facts that the FTC contends are not subject to dispute and setting forth additional facts. Docs. 104, 105, 111. In turn, the FTC disputes whether Defendants' response truly creates genuine issues of material fact. Doc. 115. After this Court issued an Opinion and Order Denying Defendants' Motion for Partial Summary Judgment on Count VI of the Amended Complaint, Doc. 117, the FTC and the Defendants filed additional arguments and submissions. Docs. 119, 120, 122, 123, 130.

Upon initial review of the tremendous volume of material submitted by the parties, this Court noticed that there were more versions of loan agreements used by certain Defendants than what was in the record at the time and that the Defendants' financial information in the record was somewhat stale and left unanswered where net profits generated by certain Defendants had gone. After entering an Order Regarding Status Conference, Doc. 124, posing certain questions,

this Court, on May 29, 2013, conducted a status conference with counsel during which Defendants' counsel volunteered to file loan agreements and additional financial material. Thereafter, Defendants filed a pleading attaching loan agreements that were used at various times by two of the Defendants. Doc. 126. Defendants also filed under seal additional financial material. Doc. 129.

Certain questions on liability—whether the language of the loan agreements under which certain Defendants made loans contravened Regulation E, the Credit Practices Rule and § 5 of the FTCA and whether certain garnishment practices violated the Credit Practices Rule and § 5—are principally questions of law. The language of the loan agreements and the garnishment practices of certain Defendants are not subject to genuine dispute. The question of whether all Defendants constitute a "common enterprise" is one on which there is some remaining dispute of fact although mostly a dispute concerning characterization of the facts and application of the law to the facts. Some of the conduct alleged to have violated § 5 and some aspects of the relief that this Court should fashion, particularly as to certain civil monetary penalties, are not questions of law readily resolved on this record.

This Court in ruling on the FTC's motion for summary judgment is obliged to construe the facts in the light most favorable to the Defendants as the non-moving party. Fed. R. Civ. P. 56. In doing so, this Court grants summary judgment on Count IV of the Amended Complaint for violation of the Credit Practices Rule and on Count V of the Amended Complaint for violation of the EFTA and Regulation E as to those Defendants that engaged in conduct in violation of those laws. This Court likewise grants partial summary judgment on Count I, but, given the muddled nature of the record and the directive to resolve disputes of material fact in

3

favor of the Defendants at this juncture, denies summary judgment on Count III, Count VI, and Count VII of the Amended Complaint.

Ordinarily, this Court would set forth the facts not subject to genuine dispute and then analyze each of the legal issues based on those facts. But the issues framed by the FTC's Motion for Summary Judgment yield themselves to consideration in separate topic areas.

## II. Facts and Issues on Summary Judgment Motion.

### A. Whether the Defendants are a "Common Enterprise" as a Matter of Law.

#### 1. Undisputed Facts Regarding "Common Enterprise" Issue.

Defendant Martin A. Webb is an enrolled member of the Cheyenne River Sioux Tribe. Doc. 53 at ¶ 1. Webb has worked in the banking industry for over thirty years. Doc. 98-1 at 5. Webb did not personally offer, provide a loan, or collect or attempt to collect on any loan, or bring any lawsuit in Cheyenne River Sioux Tribal Court against any Defendants' loan customer. Doc. 104 at ¶¶ 106-108. Webb, however, was the founder, organizer, and owner of various of the corporate Defendants sued by the FTC. Doc. 53 at ¶ 2; Doc. 105 at ¶ 2. Webb is the registered agent for each of the corporate Defendants. Doc. 97-1 at 18, 28, 36; Doc. 97-2 at 5, 15, 23, 33, 44; Doc. 97-3 at 5. Webb is the sole member of Defendants PayDay Financial LLC and Financial Solutions LLC. Doc. 97-2 at 15; Doc. 97-1 at 28.

Defendant PayDay Financial LLC has been marketing and making high-interest short-term loans to consumers nearly nationwide. PayDay Financial LLC has conducted business under trade names such as Lakota Cash, Big Sky Cash, and Big $ky Cash. Webb organized PayDay Financial LLC on October 22, 2007, and has always been its sole member and owner. Loan agreements of PayDay Financial LLC contained a wage assignment clause. Doc. 104 at

¶¶ 100-101.  PayDay Financial LLC filed some collection actions in the Cheyenne River Sioux Tribal Court against certain borrowers. Doc. 104 at ¶ 102.

PayDay Financial LLC was the sole member at the time of incorporation of the following Defendants: 24-7 Cash Direct LLC, Doc. 97-1 at 18; Management Systems LLC, Doc. 97-2 at 5; Red Stone Financial LLC, Doc. 97-2 at 23; Western Sky Financial LLC, Doc. 97-2 at 33; Red River Ventures LLC, Doc. 97-2 at 44; High Country Ventures LLC, Doc. 97-3 at 5; and Great Sky Finance LLC, Doc. 97-1 at 36.  PayDay Financial LLC on February 9, 2011, filed to "disassociate" itself under SDCL § 47-34A-605 from 24-7 Cash Direct LLC, Management Systems LLC, Red Stone Financial LLC, and Western Sky Financial LLC. Doc. 97-1 at 22; Doc. 97-2 at 9; Doc. 97-2 at 28; Doc. 97-2 at 38. Defendants state that the effect of PayDay Financial LLC disassociating itself from these other Defendants was not to cease the existence of those entities, but to make them owned and operated solely by Webb. Doc. 129 at 3.  PayDay Financial was the sole member of and has not disassociated from Red River Ventures LLC and High Country Ventures LLC; rather those two entities filed to cancel their limited liability company status with the South Dakota Secretary of State. Doc. 97-2 at 48; Doc. 97-3 at 9. All net profits generated by Red River Ventures LLC and High Country Ventures LLC ended up with PayDay Financial LLC. Doc. 129 at 2-3.[1]  A sizeable portion of the net profits of PayDay Financial LLC have been transferred to certain of Webb's limited liability companies that own land and are neither defendants in this case nor directly involved in the sub-prime lending business.[2]

---

[1] The content of this footnote is under seal at this time.

[2] The content of this footnote is under seal at this time.

5

PayDay Financial LLC was the sole member of certain named Defendants that appear to no longer function. Great Sky Finance LLC, which did business as Great Sky Cash and Great $ky Cash, was incorporated on May 15, 2009, with PayDay Financial LLC as its sole member. According to the Defendants, Great Sky Finance LLC was operational from October 13, 2009 until September 20, 2011. Doc. 104 at ¶ 17. During the time it was operational, Great Sky Finance LLC offered small dollar, high-interest, short-term consumer loans. Doc. 104 at ¶ 18. Great Sky Finance LLC used loan agreements with various versions of wage assignment clauses. Doc. 104 at ¶ 27; Doc. 111-15 at 6; Doc. 126-1 at 3; Doc. 126-2 at 3; Doc. 126-3 at 3.[3] However, Great Sky Finance LLC apparently did not do collections work, left collections work to a different Defendant, and thus itself did not garnish consumer wages or sue consumers in the Cheyenne River Sioux Tribal Court. Doc. 104 at ¶¶ 21-26.

The next named Defendant—Western Sky Financial LLC—similarly was incorporated on May 15, 2009, with PayDay Financial LLC as its sole member. Doc. 97-2 at 31-33. Western Sky Financial LLC offered small dollar, short-term, high-interest installment loans, but appears not to have included a wage assignment clause in its loan agreements. Doc. 104 at ¶¶ 77,80,84; Docs. 126-5, 126-6, 126-7, 126-8, 126-9, 126-10, 126-11. Western Sky Financial LLC employs

---

[3]Great Sky Finance LLC may have abandoned the wage assignment language in loan agreements from and after December of 2010, as the final version of the loan agreement used by Great Sky Finance LLC appears not to have a wage assignment clause. Doc. 126-4. Prior versions of its loan agreements include Doc. 126-1 and Doc. 126-2, which provided that the wage assignment clause could be revoked with ten days written notice. The Great Sky Finance LLC loan agreement at Doc. 126-3 added that, after the ten day period to revoke the wage assignment clause through written notice, a customer may opt out of the wage assignment clause by phone. Doc. 126-3 at 3. Another Great Sky Finance LLC loan agreement appears at Doc. 111-15, and allowed a customer to opt out of the wage assignment clause, but only if the customer did so in writing within thirty days of the date of the agreement.

approximately eighty individuals, almost all of whom work exclusively for Western Sky Financial LLC. Doc. 104 at ¶ 79. Although Western Sky Financial LLC appears to do some collection work, Defendants maintain that it never engaged in wage garnishment, communication with any consumer's employer, or suits against consumers in the Cheyenne River Sioux Tribal Court. Doc. 104 at ¶¶ 81-85.

Red Stone Financial LLC was incorporated on February 10, 2010, with PayDay Financial LLC as its sole member. Doc. 97-2 at 21-23. Red Stone Financial LLC was disassociated from PayDay Financial LLC on February 9, 2011. Doc. 97-2 at 27-28. Red Stone Financial LLC offered small dollar, short-term consumer loans with the loan agreement apparently not containing a wage assignment clause. Doc. 104 at ¶¶ 65, 67. Red Stone Financial LLC appears not to have done any of its collection work and thus did not directly engage in the collection conduct that the FTC challenges. Doc. 104 at ¶¶ 69-75.

The next named Defendant—Management Systems LLC—was incorporated on March 2, 2009, with PayDay Financial LLC as its sole member. Doc. 97-2 at 3-5. Management Systems LLC is neither a lender nor a collection business. Doc. 104 at ¶¶ 39-45. Rather, Management Systems LLC "performs or performed accounting and payroll activities for Defendants Financial Solutions, PayDay Financial, Western Sky Financial, Great Sky Finance, and Red Stone Financial." Doc. 104 at ¶ 48. Management Systems LLC in recent years has generated substantial income, most of which has been transferred to limited liability companies owned by Webb and not directly connected to sub-prime lending.[4]

---

[4]The content of this footnote is under seal at this time.

Defendant 24-7 Cash Direct LLC was incorporated on May 15, 2009, with PayDay Financial LLC as its sole member. Doc. 97-1 at 16-18. According to the Defendants, "24-7 Cash Direct is not now, nor has ever been, operational." Doc. 104 at ¶ 2. Defendants maintain that 24-7 Cash Direct never loaned any money or sought to collect from anyone. Doc. 104 at ¶¶ 2-15. However, FTC provided screen shots of 24-7 Cash Direct's website that appeared to be soliciting potential borrowers to apply for loans through the website. Doc. 97-5 at 12-19.

The next named Defendant—Red River Ventures LLC—was, according to the Defendants, operational from approximately March 2009 until April 2009. Doc. 104 at ¶ 54. During that time, Red River Ventures LLC offered small dollar, short-term consumer loans, but did so without any wage assignment clause and without performing collection work. Doc. 104 at ¶¶ 55-62. The same was true of the next named Defendant, High Country Ventures LLC, which was operational during the same time as Red River Ventures LLC, offered loans, but performed no collection services. Doc. 104 at ¶¶ 29-37. All revenues generated by Red River Ventures LLC and High Country Ventures LLC were both gross and net profit, indicating that other Defendants were bearing the costs of these entities' operations. Doc. 119-8; Doc. 119-9. Both these entities transferred all of their assets to PayDay Financial LLC, have no current assets or operations, and have cancelled their limited liability company status.

The final corporate Defendant—Financial Solutions LLC—was organized by Webb with Webb as the sole member. Doc. 97-1 at 28; Doc. 105 at ¶ 3. Financial Solutions LLC ceased operations when this case commenced. Doc. 98-1 at 15-16. Financial Solutions LLC was organized to purchase bad debt and delinquent loans, with most of those purchases from Allied Funding LLC, an entity not named in this suit and not owned by any of the Defendants. Doc.

8

104 at ¶ 91.  Some of the bad debt purchased by Financial Solutions LLC and on which it performed collections included loans originated by Great Sky Finance LLC. Doc. 111-3 at 7; Doc. 104 at ¶ 94.  Financial Solutions LLC used the wage assignment clauses in Great Sky Finance LLC's loan agreements to collect from consumers and employers of certain consumers. Doc. 98-3 at 14-15.

All of the Defendants who issued loans used loan agreements that contained clauses authorizing electronic fund transfers ("EFT") from consumer accounts to repay loans. Doc. 99-2 at 5; Doc. 111-11 at 3; Doc. 99-2 at 19; Doc. 99-2 at 24; Doc. 111-10 at 3; Doc. 111-5 at 3. Many of those loan agreements allowed consumers to opt out of the EFT authorization.

Webb was involved not only in establishing, but also in managing each of the nine corporate Defendants.  During their operations, each of the corporate Defendants had its principal place of business either at 612 East Street or at a separate structure at 602 East Street in Timber Lake, South Dakota. Doc. 105 at ¶ 10.  A few employees worked for more than one of the corporate Defendants. Doc. 104 at ¶¶ 79, 89, 99. Each corporate Defendant maintained its own bank account and did not commingle funds with another Defendant, although monies have transferred from some corporate Defendants to PayDay Financial LLC, and from two of the Defendants to non-defendant limited liability companies owned and operated by Webb.

## 2. Application of the law of "common enterprise."

To prevent individuals and companies from using corporate structures to circumvent the FTCA courts have created a "common enterprise" exception to general common law principles; a "common enterprise" of defendants may be jointly and severally liable for violations of the FTCA. P.F. Collier & Son Corp. v. FTC, 427 F.2d 261, 267 (6th Cir. 1970). "Where one or

more corporate entities operate in common enterprise, each may be held liable for the deceptive acts and practices of the others." FTC v. Think Achievement Corp., 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000).  That is, where the same individuals transact business through a "maze of interrelated companies," the whole enterprise may be held liable for FTCA violations.  FTC v. J.K. Publ'ns, Inc., 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000).  In determining whether a "common enterprise" exists, courts have looked to factors including "common control; the sharing of office space and officers; whether business is transacted through a maze of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants." FTC v. Nat'l Urological Grp., Inc., 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008); J.K. Publ'ns, 99 F. Supp. 2d at 1202.

Viewing the facts in the light most favorable to the Defendants who are the non-movants on summary judgment, this Court finds there to be a genuine issue of material fact as to whether the entity that Defendants say never functioned—24-7 Cash Direct LLC—could be considered part of a "common enterprise" with any other Defendant.  There also is a genuine issue of material fact as to whether Management Systems LLC, which did payroll and accounting functions, could be considered part of a "common enterprise" in this case where the conduct at issue is the marketing and offering of loans and collection practices thereon.  However, questions about Management Systems LLC being part of a "common enterprise" arise from the sizeable income it amassed from other Defendants and the transfer of those monies to Webb's other non-party limited liability companies.

10

PayDay Financial LLC appears to be a common enterprise with the entities for which it was the sole member and which offered similar types of loans; that is, Red River Ventures LLC, High Country Ventures LLC, Great Sky Finance LLC, Western Sky Financial LLC, and Red Stone Financial LLC may well comprise a "common enterprise" with PayDay Financial LLC. After all, PayDay Financial LLC or some entity affiliated with it covered all operating expenses of Red River Ventures LLC and High Country Ventures LLC, and PayDay Financial LLC received all profits from those two entities.  Doc. 129 at 2.

Webb, who directly or indirectly through PayDay Financial LLC owned each of the entities and has directed and controlled the operations, appears to be part of some "common enterprise."  After PayDay Financial LLC disassociated from certain of the Defendants, Webb ran them directly as their owner.  Doc. 129 at 3.  Webb was the decision maker who ultimately ran each of the entities and presumably the one who directed vast monies to be transferred from PayDay Financial LLC to non-party limited liability companies he owned.  Ultimately, the FTC has more to prove against Webb, however, before he may be held personally liable for the conduct of the corporate Defendants.  In cases brought by the FTC, individual defendants "are liable for the corporate defendant's violations if the FTC demonstrates that (1) the corporate defendant violated the FTC Act; (2) the individual defendants participated directly in the wrongful acts or practices or the individual defendants had authority to control the corporate defendants; and (3) the individual defendants had some knowledge of the wrongful acts or practices."  Nat'l Urological Grp., Inc., 645 F. Supp. 2d at 1207 (citation omitted).  "To satisfy the knowledge requirement, the FTC must establish that the individual defendant either: (1) had actual knowledge of the wrongful acts or practices; (2) was recklessly indifferent to whether or

not the corporate acts or practices were fraudulent; or (3) had an awareness of a high probability that the corporation was engaged in fraudulent practices along with an intentional avoidance of the truth." J.K. Publ'ns, 99 F. Supp. 2d at 1204.

Under the circumstances, there are many attributes of a common enterprise among many of the Defendants. PayDay Financial LLC is connected to Financial Solutions LLC, both by Webb being the sole member of each and collections that Financial Solutions LLC did for some of PayDay Financial LLC's entities. Webb and the corporate Defendants have conducted business from the same two addresses on East Street in Timber Lake; some employees are shared; although corporate funds appear to be held separately, those funds are passed to PayDay Financial LLC and Management Systems LLC and from those entities then to non-defendant limited liability companies owned by Webb; and the nature of almost all of the corporate Defendants have a common focus on marketing and making sub-prime loans and collecting thereon. Notwithstanding the hallmarks of some "common enterprise," as a matter of law in summary judgment, this Court cannot declare all of the Defendants to constitute a "common enterprise." There is some common enterprise here, but which Defendants and whether all Defendants are part of a common enterprise is a matter left open for trial.

## B. Whether Defendants violated the EFTA or Regulation E.

### 1. Facts Regarding EFT Clauses in Loan Agreements.

The Defendants that entered into consumer loan agreements—PayDay Financial LLC, Great Sky Finance LLC, Western Sky Financial LLC, Red River Ventures LLC, High Country Ventures LLC, and Red Stone Financial LLC—had as a part of each loan agreement language providing for EFT. This EFT language in the loan agreements varied somewhat over time. The

following is an example of an EFT authorization from a PayDay Financial LLC d/b/a Lakota Cash loan agreement:

> By electronically signing this Loan Agreement below, you certify that you have fully read and understood the ACH AUTHORIZATION provisions of this Loan Agreement, you agree to comply with, and be bound by, their terms and you agree and understand that you are authorizing us to effect both debit and credit entries into your Bank Account to fulfill your obligations under this Loan Agreement.

Doc. 96-6 at 24; Doc 96-5 at 32-33 (PayDay Financial LLC d/b/a Lakota Cash loan agreement containing a nearly identical clause); Doc. 96-2 at 13(Big $ky Cash loan agreement, which was a trade name of PayDay Financial LLC, stating "[a]ny payment due on the Note shall be made by us effecting one or more ACH debit entries to your account at the Bank").

In support of its argument that the Defendants violated the EFTA and Regulation E, the FTC's pleadings point to three particular loan agreements as examples. See Doc. 94 at 24; Doc. 95 at ¶ 31. These loan agreements had EFT authorization clauses and contained language allowing for the cancellation of the authorization but only if the consumer owed no debt. Specifically, these loan agreements stated:

> The ACH/EFT Authorizations set forth in this Loan Agreement are to remain in full force and effect for this transaction until your indebtedness to us for the total of payments, plus any late or NSF fee incurred, is fully satisfied. You may only revoke the above authorization by contacting us directly, and only after you have satisfied your indebtedness to us.

Doc. 96-2 at13 (containing language from Big $ky Cash loan agreement); Doc. 96-5 at 29 (PayDay Financial LLC d/b/a Lakota Cash loan agreement containing same language); Doc. 96-6 at 22 (PayDay Financial LLC d/b/a Lakota Cash loan agreement containing same language).

Because of the confusing state of the record, this Court asked the following question in its Order Regarding Status Conference: "In those loan agreements with Electronic Fund Transfer (EFT) terms, does any language—by Document number and page—make clear that the extension of credit is not conditioned on a customer's repayment by EFT?" Doc. 124 at 3. The Defendants responded by pointing to language in Western Sky Financial LLC's loan agreements that allowed consumers to cancel the EFT authorization at any time. See also Doc. 103 at 34-35 (quoting language from Western Sky Financial LLC's loan agreements). Western Sky Financial LLC's loan agreements provided in pertinent part:

> You understand that you can cancel this authorization at any time (including prior to your first payment due date) by sending written notification to us. Cancellations must be received at least three business days prior to the applicable due date. This EFT debit authorization will remain in full force and effect until the earlier of the following occurs: (i) you satisfy all of your payment obligations under this Loan Agreement or (ii) you cancel this authorization.

Doc 104 at ¶ 80. However, no loan agreement at any point advised the consumer that the consumer could receive a loan from these Defendants without initially agreeing to EFTs from the consumer's bank account.

## 2. Application of the EFTA and Regulation E.

Under Regulation E, the implementing regulation of the EFTA, "[n]o . . . person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers . . . ." 12 C.F.R. § 205.10(e)(1); 15 U.S.C. § 1693k(1). In turn, 12 C.F.R. § 205.2(j) defines "person" as a "natural person or an organ ization, including a corporation . . . ." PayDay Financial LLC, Western Sky Financial LLC, Great Sky Finance LLC,

Red River Ventures LLC, High Country Ventures LLC, and Red Stone Financial LLC are all "persons" for purposes of applying § 205. There is no question that these same Defendants were extending credit, that is, extending to consumers the right to "incur debt and defer its payment." 12 C.F.R. § 205.2(f). The loan agreements contemplated "preauthorized electronic fund transfers," in that they authorized transfers directly from consumers' accounts which would be "electronic fund transfer[s] authorized in advance to recur at substantially regular intervals." 12 C.F.R. § 205.2(k).

The Defendants defend the practices of PayDay Financial LLC, Western Sky Financial LLC, Great Sky Finance LLC, Red River Ventures LLC, High Country Ventures LLC, and Red Stone Financial LLC by asserting that "in practice *no defendant* conditioned the extension of credit on a consumer agreeing to electronic fund transfers" and that the clauses were for "the consumer's convenience" and "revocable at any time." Doc. 103 at 35. However, § 205.10(e)(1) makes clear that there shall be no extension of credit to a consumer conditioned on repayment by preauthorized EFTs. 15 U.S.C. § 1693k(1). The only exceptions to § 205.10(e)(1) are "for credit extended under an overdraft credit plan or extended to maintain a specified minimum balance in the consumer's account," neither of which exception applies to the Defendants' lending business or practices. There is no exception to § 205.10(e)(1) for "consumer's convenience."

The loan agreements cited by the FTC made the loans conditioned on EFTs. Indeed some of these loan agreements provided that any loan payment by a consumer "shall be made by us [meaning the Defendant lender] effecting one or more ACH debit entries to your Account at the Bank." Doc. 96-2 at13. These loan agreements made revocation possible "only after you have satisfied your indebtedness to us." Doc. 96-2 at 13; Doc. 96-5 at 29; Doc. 96-6 at 22. Because

15

these loan agreements made the extension of credit conditional on the consumer agreeing to EFTs, these loan agreements were violative of Regulation E.

The language in the Western Sky Financial LLC loan agreements made the EFT authorization revocable "at any time (including prior to your first payment due date) by sending written notification to us." Doc. 104 at ¶ 80. No provision of any of the Defendants' loan agreements, however, expressly states that the consumer does not need to authorize EFT at all to receive a loan or provides a means by which a consumer can obtain a loan without initially agreeing to EFT. Defendants no doubt would argue that a consumer could infer from the language that, if the EFT can be revoked "prior to your first payment due date," then the loan is not conditioned on agreement to the EFT clause. This argument, albeit in the context of a ruling in a motion to dismiss, was rejected in O'Donovan v. CashCall, Inc., No. C 08-03174 MEJ, 2009 WL 1833990 (N.D. Cal. June 24, 2009). In O'Donovan, the court considered whether to dismiss a claim that a consumer lender violated 15 U.S.C. § 1693k(1) and 12 C.F.R. § 205.10(e)(1) by conditioning the extension of credit on preauthorized EFTs. The court in O'Donovan reasoned:

> Defendant [the consumer lender] argues that because a consumer is permitted to cancel an EFT authorization at any time, including prior to first scheduled payment, the extension of credit is not conditioned on use of EFTs for repayment . . . . However, the right to later cancel EFT payments does not allow a lender who conditions the initial extension of credit on such payments to avoid liability.

Id. at *3. This Court agrees.

The lending Defendants have never issued a consumer loan without the consumer initially entering into a loan agreement containing an EFT clause. Although the Western Sky Financial LLC loan agreements contain EFT clauses vastly improved over the EFT clauses in the loan

16

agreements cited by the FTC, the fact remains that there is no language expressly stating that the extension of credit is not conditioned on agreement initially to EFT or explaining how a consumer might obtain a consumer loan from Defendants otherwise. The arguments of the lending Defendants that "in practice" they did not condition the extension of credit on consent to EFTs ignores that in reality their loan agreements did just that. The language used by Western Sky Financial LLC conditioning credit on an EFT clause, albeit one revocable at any time, is a violation somewhat technical in nature and use of this EFT clause is not likely to merit much, if any, monetary penalty. Nevertheless, the Western Sky Financial LLC EFT clause, as well as the EFT clauses used by other lending Defendants, violate the EFTA and Regulation E. Summary judgment on Count V of the Amended Complaint in favor of the FTC is granted.

## C. Whether any Defendant violated the Credit Practices Rule as a matter of law.

### 1. Facts Regarding Wage Assignments and Garnishments.

In Count IV, the FTC alleges that the Defendants violated the Credit Practices Rule by using an unlawful wage assignment clause in their loan contracts. Defendant PayDay Financial LLC, the entity that made the majority of the loans, first offered their high-interest, short-term loans on May 12, 2008. Doc. 99-2 at 5. PayDay Financial LLC began including wage assignment clauses in at least some of its loan agreements on October 10, 2009. Doc. 99-2 at 5. By way of illustration, contract language from a loan agreement of PayDay Financial LLC d/b/a Lakota Cash at one point provided:

> Should you default on this Agreement, you hereby consent and agree to the potential garnishment of wages by us or our assigns or service agents to ensure repayment of this Agreement, fees and costs associated in the collection of outstanding principal and interest.

Case 3:11-cv-03017-RAL   Document 131   Filed 09/30/13   Page 18 of 34 PageID #: 3343

. . .

> You may choose to opt out [of] the Garnishment provision, but only by following the process set-forth below. If you do not wish to be subject to this Garnishment Provision, then you must notify us in writing within (10) calendar days of the date of this Agreement . . . .

Doc. 96-1 at 11-12; Doc. 96-3 at 13.  Wage assignment clauses substantially similar to this appear in loan agreements used by Defendant Great Sky Finance LLC.  Doc. 111-5 at 3; Doc. 111-15 at 6; Doc. 126-1 at 3; Doc. 126-2 at 3.[5]  Other Defendants who offered loans—Western Sky Financial LLC, Red Stone Financial LLC, High Country Ventures LLC, and Red River Ventures LLC—apparently did not utilize such a clause.

PayDay Financial LLC revised the wage assignment clauses on June 7, 2010, Doc. 99-2 at 5, as found in a PayDay Financial LLC d/b/a Lakota Cash agreement, to read:

> Should you default on this Agreement, you hereby consent and agree to the potential preauthorized garnishment of wages by us or our assigns or service agents to insure repayment of this Agreement, fees and costs associated in the collection of outstanding principal and interest.

. . .

> You may choose to opt out [of] the Preauthorized Garnishment Provision, but only by following the process set forth below. If you do not wish to be subject to this Preauthorized Garnishment Provision, then you must notify us in writing within (10) calendar days of the date of this Agreement . . . . After the ten day deadline, you may choose to opt out of the Preauthorized Garnishment Provisions, however, you must CALL . . . and

---

[5]The FTC does not specifically identify which Defendants allegedly violated the Credit Practices Rule.  However, the relevant portions of the FTC's briefs and statement of material facts indicate that the FTC is focusing its Credit Practices Rule allegations and corresponding request for a civil penalty on the actions of PayDay Financial LLC alone.

18

indicate your desire to opt out of the Preauthorized Garnishment Provisions.

Doc. 96-6 at 15. PayDay Financial LLC removed the wage assignment clauses from all of its loan agreements on September 10, 2011, after the FTC began this case. Doc. 99-2 at 5.

PayDay Financial LLC used a wage garnishment packet beginning in October or November 2009 through December 28, 2011. Doc. 99-2 at 6-7.[6] PayDay Financial LLC never obtained a court order for garnishment. Doc. 99-2 at 42. Instead, PayDay Financial LLC borrowed language from the materials that the United States Government uses for garnishment under the Debt Collection Improvement Act of 1996 ("DCIA"). Doc. 97-7. PayDay Financial LLC contacted the consumers' employers using forms tailored from the Government's forms under the DCIA. Docs. 98-5, 97-7, 96-4, 96-3.

The letter used by PayDay Financial LLC asserted that the "Indian Commerce Clause of the United States Constitution and the laws of the Cheyenne River Sioux Tribe permit agencies to garnish the pay of individuals who owe such debt without first obtaining a court order." Doc. 96-1 at 5. In reality, the Indian Commerce Clause of the United States Constitution has nothing to do with garnishment, but grants to Congress the authority "to regulate Commerce . . . with the Indian Tribes." U.S. Const. art. I, § 8. The Defendants acknowledge that no law of the Cheyenne River Sioux Tribe existed either to permit or to forbid garnishment without a court order. Doc. 99-2 at 35.

By use of the garnishment packet, PayDay Financial LLC between October of 2009 and November or December of 2011 collected $946,825.62 of principal, $280,216.52 in finance fees,

---

[6]Financial Solutions employed a wage garnishment packet as well. See Doc. 111-8 at 3.

19

and $76,633.25 in other fees, for a total of $1,303,675.39. Doc. 99-2 at 48-49. Financial

Solutions LLC collected a total of $181,644.42 by use of the garnishment packet. Doc. 99-2 at

49. Of that total, $120,753.09 were principal payments, $39,407.48 were finance charges, and

$21,483.85 were fees. The FTC does not seek disgorgement of the principal balance from

PayDay Financial LLC or Financial Solutions LLC, but seeks this Court to grant summary

judgment for disgorgement of the interest and fees collected through such directives to employers

to garnish debtors' wages.

### 2. Application of Credit Practices Rule to wage assignment clauses.

The FTC in 1984 promulgated the Credit Practices Rule, 16 C.F.R. Part 444, to address

certain unfair collection practices, including certain wage assignment clauses. Am. Fin. Servs.

Ass'n v. FTC, 767 F.2d 957, 962-63 (D.C. Cir.1985). Wage assignments, unlike court orders

for garnishment, occur without the procedural safeguards of a court hearing and an opportunity

for debtors to assert defenses or counterclaims. A wage assignment may interfere with

employment relationships and can injure consumers who may have valid reasons for nonpayment

and who rely on wage income to support themselves and their families. Id. at 974-75.

The Credit Practices Rule does not make all wage assignments unlawful. Rather,

§ 444.2(a)(3) generally prohibits lenders from including wage assignment clauses in loan

agreements, unless the clause: (i) is, by its terms, revocable at the will of the debtors; (ii) is a

payroll deduction plan or preauthorized payment plan, commencing at the time of the transaction,

in which the consumer authorizes a series of wage deductions as a method of making each

payment; or (iii) applies only to wages or other earnings already earned at the time of the

assignment. 16 C.F.R. § 444.2(a)(3). The wage assignment clause that was in some of PayDay

Financial LLC's loan agreements does not satisfy the exceptions contained in § 444.2(a)(3)(ii) or (iii), and the Defendants do not make any argument under those exceptions. Rather, the Defendants note that the wage assignment clause was revocable within ten days of issuance of the loan and argue that, in practice, those Defendants who offered loans including wage assignments allowed consumers to revoke the clause at any time.

The first exception in the Credit Practices Rule to the general prohibition on wage assignment clauses requires that the clause is "by its terms, revocable at the will of the debtor." 16 C.F.R. § 444.2(a)(3)(i). That is, the first exception focuses on the terms of the loan agreement. At least some of the PayDay Financial LLC loan agreements used from October 10, 2009 to June 7, 2010, contained wage assignment clauses that consumers could opt out of, but only if they did so in writing within ten calendar days of the date of the agreement. Other than during the first ten days, this version of the loan agreement contained no means for a borrower to revoke the wage assignment clause. Such a ten-day limitation for opt out of the wage assignment clause violates § 444.2(a)(3)(i)'s requirement that a wage assignment clause, by its terms, be "revocable at the will of the debtor."

The FTC is not seeking a civil penalty for PayDay Financial LLC's use of wage assignment clauses after June 7, 2010. Doc. 114 at 36. Nevertheless, the FTC argues that PayDay Financial LLC's post-June 7, 2010 wage assignment clauses violated § 444.2(a)(3). Unlike the pre-June 7, 2010 loan agreements, the post-June 7, 2010 loan agreements allowed the consumer to opt out of the wage assignment clause at any time. Curiously, the consumer could do so only in writing within ten calendar days of the agreement and thereafter only by calling the customer service department. The question thus becomes whether "by its terms" the post-June

21

7, 2010 wage assignment clause was "revocable at the will of the debtor;" it was revocable at the will of the debtor but on conditions such as written notification within ten calendar days of the loan and thereafter only by phone request. Ideally, the post-June 7, 2010 wage assignment clause should have expressly stated that the wage assignment was revocable at any time freely on the will of the debtor, without any condition other than notice to the lending defendant by writing or oral request. The post June 7, 2010 wage assignment clause is not ideal, but the language of the clause did not violate § 444.2(a)(3). Accordingly, summary judgment on Count IV is granted, but only as to the wage assignment clauses appearing in PayDay Financial LLC's loan agreements between October 10, 2009 and June 7, 2010.

### D. Whether other violations exist under § 5 of the FTCA.

#### 1. Law Regarding § 5 of FTCA.

In Counts I, II, III, VI, and VII of the Amended Complaint, the FTC alleges other conduct by Defendants to have violated § 5 of the FTCA. The FTC moves for summary judgment on each of those claims, except for Count II.

Compared to specific provisions of the Credit Practices Rule or Regulation E, § 5 of the FTCA is more sweeping and general. Section 5 prohibits entities from engaging in unfair or deceptive acts or practices in interstate commerce by providing:

> (1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.
> (2) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, [except certain specified financial and industrial sectors] from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

15 U.S.C. § 45(a). To establish that an act or practice is deceptive under § 5, the FTC must demonstrate that 1) there was a representation; 2) the representation was likely to mislead consumers acting reasonably under the circumstances; and 3) the representation was material. FTC v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003); FTC v. Gill, 265 F.3d 944, 950 (9th Cir. 2001). A representation is "material" if it is likely to affect the consumer's conduct or decision regarding the product or service. Kraft, Inc. v. FTC, 970 F.2d 311, 322 (7th Cir. 1992); FTC v. LoanPointe, Inc., No. 2:10-CV-225DAK, 2011 WL 4348304, at *5 (D. Utah Sept. 16, 2011). Express and deliberate claims are presumed to be material. FTC v. Pantron I Corp., 33 F.3d 1088, 1095-96 (9th Cir. 1994); LoanPointe, 2011 WL 4348304, at *4; FTC v. SlimAmerica, Inc., 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999). To be unfair, a practice must be likely to cause substantial injury to consumers, not reasonably avoidable by consumers themselves, and not outweighed by countervailing benefits to consumers or to competition. 15 U.S.C. § 45(n); FTC v. Accusearch Inc., 570 F.3d 1187, 1193 (10th Cir. 2009).

### 2.  Conduct allegedly violative of § 5.

#### a. Communication concerning wage assignments and garnishments.

Earlier in this decision, the language used by PayDay Financial LLC to collect on wage assignments was quoted. Other than Great Sky Finance LLC, the remaining Defendants appear not to have used wage assignment clauses, and only Financial Solutions LLC and PayDay Financial LLC performed collection services using the wage assignment clauses and garnishment practice.

When a borrower whose loan agreement contained a wage assignment clause defaulted on the loan agreement and failed to work toward paying off the loan, PayDay Financial LLC and

23

Financial Solutions LLC on occasion sent a garnishment packet to the borrower's employer. Doc. 96-1 at 5-16; Doc. 98-5 at 41-51. The garnishment packet began with a letter to the employer that notified the employer of its employee's delinquent debt and stated:

> The Indian Commerce Clause of the United States Constitution and the laws of the Cheyenne River Sioux Tribe permit agencies to garnish the pay of individuals who owe such debt without first obtaining a court order.

Doc. 96-1 at 5 (PayDay Financial LLC d/b/a/ Lakota Cash garnishment packet); Doc. 98-5 at 41 (Financial Solutions LLC garnishment packet).[7] The other enclosures included a worksheet on which appeared the following directive:

> <u>NOTICE TO EMPLOYERS</u>:   THE EMPLOYER MUST COMPLETE AND RETURN THIS CERTIFICATION TO PAY DAY FINANCIAL, LLC WITHIN 10 DAYS OF RECEIPT.

Doc. 96-1 at 9 (PayDay Financial LLC d/b/a/ Lakota Cash garnishment packet); Doc. 98-5 at 45 (Financial Solutions LLC garnishment packet).

Applying the § 5 analysis, there clearly were representations made to employers. Those representations included that "[t]he Indian Commerce Clause of the United States Constitution and the laws of the Cheyenne River Sioux Tribe permit agencies to garnish the pay of individuals who owe such debt without first obtaining a court order," and that employers were required to respond to a portion of the garnishment packet within ten days. These representations were likely to mislead employers and were deceptive. No part of the Indian Commerce Clause permits the garnishment of pay. As previously decided by this Court:

---

[7]Some of the wage garnishment packets sent by PayDay Financial LLC employed slightly different language. <u>See</u> Doc. 96-6 at 8.

24

The "Indian Commerce Clause" refers to part of the Commerce Clause, which states that Congress shall have the power "[t]o regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art I, § 8, cl.3. Thus, the "Indian Commerce Clause" provides for federal authority, exclusive of the states, in dealings with Indian tribes, <u>Worcester v. Georgia</u>, 31 U.S. (6 Pet.) 515, 561 (1832), but does not provide a basis for tribal jurisdiction over non-Indians.

<u>FTC v. PayDay Fin., LLC</u>, No. CIV 11-3017-RAL, 2013 WL 1309437, at *4 n.3 (D.S.D. Mar. 28, 2013). The Indian Commerce Clause provides no authority for these Defendants to seek to garnish consumers' wages from their employers. Likewise, as the Defendants have conceded, there is nothing in the laws of the Cheyenne River Sioux Tribe that permits or precludes garnishment without a court order. Doc. 99-2 at 35. The Cheyenne River Sioux Tribe Code is silent as to garnishment. However, the representation by PayDay Financial LLC and Financial Services LLC is not that the Cheyenne River Sioux Tribe Code is silent, but rather that the Tribe's laws "permit agencies to garnish the pay of individuals who owe such debt without first obtaining a court order." Doc. 96-1 at 5. In addition, there is no source of law anywhere that an employer of a loan customer "must complete and return" a certification form within ten days to the Defendants. <u>See</u> Doc. 96-1 at 9.

The representations listed above were material, as reflected by the amount that PayDay Financial LLC and Financial Solutions LLC were able to collect through garnishment. Through the garnishment procedure, PayDay Financial LLC collected a total of $1,303,675.39, and Financial Solutions LLC collected a total of $181,644.42, for a total of $1,485,319.81. Doc. 99-2 at 48-49. Of that total, $417,740.10 was collected through garnishment for finance charges, interest, and fees. Doc. 99-2 at 48-49. Statements by PayDay Financial LLC and Financial

25

Solutions LLC in the garnishment packet to the employers of loan customers regarding the garnishment of wages were violative of § 5, and the FTC is entitled to summary judgment on Count I.

The garnishment packets used by PayDay Financial LLC and Financial Solutions LLC were not the only way these Defendants communicated with borrowers' employers. On some occasions, PayDay Financial LLC and Financial Solutions LLC communicated with borrowers' employers via written correspondence or over the telephone. Doc. 105 at ¶¶ 42-43; Doc. 96-3 at 3; Doc. 99-1 at 7-8,11-12. These communications concerned garnishment of the borrowers' wages and generally occurred after PayDay Financial LLC or Financial Solutions LLC had sent the employers a garnishment packet. Count III of the Amended Complaint alleges that these communications took place "without consumers' knowledge or consent" and that the communications disclosed the existence and occasionally the amount of the consumers' debt. Doc. 44 at 16-17. The FTC alleges that the communications constitute an unfair practice under § 5. There is very little evidence in the record concerning how often these communications occurred and what was said during the telephone conversations. There remains a question of fact concerning whether the borrowers were aware that PayDay Financial LLC or Financial Solutions LLC would be communicating with their employers or that the communications coming after the garnishment packets were sent caused or were likely to cause substantial injury to the borrowers. Accordingly, this Court denies the FTC's motion for summary judgment on Count III.

### b. Allegedly unfair practice of bringing suit in tribal court.

Count VI of the Amended Complaint focuses on Defendants' practice of suing consumers in Cheyenne River Sioux Tribal Court. The FTC in the Amended Complaint does not

specifically identify which Defendants sued consumers in tribal court. However, the relevant portions of the FTC's briefs and statement of material facts indicate that the FTC is focusing its allegations under Count VI of the Amended Complaint on the actions of PayDay Financial LLC alone. PayDay Financial LLC filed 1,123 lawsuits against consumers in the Cheyenne River Sioux Tribal Court. Doc. 99-2 at 42. As a result, PayDay Financial LLC collected a total of $18,461.24 from consumers, $3,952.50 of which was based on tribal court judgments in such lawsuits. Doc. 99-2 at 43. The FTC asserts that suing consumers in tribal court was an unfair practice under § 5 because the tribal court lacked subject matter jurisdiction over the consumers. Doc. 94 at 20-22.

This Court released a prior Opinion and Order Denying Defendants' Motion for Partial Summary Judgment on Count VI. PayDay Fin., LLC, 2013 WL 1309437. That Opinion and Order addressed at length the question of whether the Defendants were entitled to summary judgment on the FTC's claims that it was an unfair practice to bring suits in the Cheyenne River Sioux Tribal Court. In denying summary judgment, this Court addressed at length the thorny question of tribal court jurisdiction over the borrowers under the typical language of the lending Defendants' loan agreements. That Opinion and Order concluded that there were two questions of fact prompting the Court to deny summary judgment: 1) The "record lacks information establishing that the Defendants are in fact 'members' of the tribe for purposes of the first Montana [v. United States, 450 U.S. 544, 565 (1981)] exception;" and 2) "an ambiguity in the contract exists as to under what circumstances the non-Indian is consenting to tribal court jurisdiction in addition to binding arbitration." Id. at *1.

27

Following that decision, the FTC and the Defendants filed pleadings making additional arguments. Docs. 120, 122, 123, 130. This Court is skeptical that South Dakota limited liability companies merely licensed with the Cheyenne River Sioux Tribe become tribal members and thereby can invoke tribal court jurisdiction over the consumers under the language of the consumer loan agreements. But see J.L. Ward Assocs., Inc. v. Great Plains Tribal Chairmen's Health Bd., 842 F. Supp. 2d 1163, 1171-77 (D.S.D. 2012) (evaluating circumstances where entity created under state law by various tribes to represent the tribes possessed tribal sovereign immunity). This Court is going to consider testimony on whether the Defendants constitute a common enterprise and whether Webb is personally liable for the violations by the corporate Defendants. The parties can present testimony on whether any Defendant other than Webb somehow is a "member" of a tribe within the meaning of the first Montana exception. The record as it exists presently leaves some issue of fact in that regard.

### c. Allegedly deceptive statements to consumers.

Count VII of the Amended Complaint concerns PayDay Financial LLC's use of the following provision in certain loan agreements:

> Should you default on this Agreement, you hereby consent and agree to the potential garnishment of wages by us or our assigns or service agents to ensure repayment of this Agreement, fees and costs associated in the collection of outstanding principal and interest. You also expressly agree to the sole application of the Indian Commerce Clause of the US Constitution and the laws of the Cheyenne River Sioux Tribe regarding this Agreement and the potential garnishment of wages, and the sole jurisdiction of the Cheyenne River Sioux Tribal Court regarding any and all matters arising therefrom.

Doc. 96-1 at 11-12; 96-3 at 13.[8] The FTC asserts that this provision "represent[ed] to consumers that, in the event of nonpayment, Defendants will sue consumers in tribal court, that the tribal court can legitimately consider such suits, and that Defendants will obtain valid judgments and relief in that court." Doc. 94 at 15. Such an assertion was deceptive, the FTC's argument goes, because "the tribal court does not have subject matter jurisdiction over Defendants' claims against nonmembers." Doc. 94 at 15. Whether this argument is ultimately successful turns in large part on whether the Cheyenne River Sioux Tribal Court has jurisdiction over consumers under the language of the lending Defendants' loan agreements. Some loan agreements of PayDay Financial LLC when read in full contain confusing terms appearing to specify binding arbitration as an exclusive remedy yet tribal court jurisdiction as well. As previously noted, this inconsistency in terms in the PayDay Financial "lending contract leaves [b]orrowers lacking the requisite foreseeability that there will be tribal court jurisdiction—as opposed to arbitration on the [Cheyenne River Indian] Reservation . . . ." PayDay Fin., LLC, 2013 WL 1309437, at *14. Because there are questions of fact on the issue of tribal subject matter jurisdiction and how consumers would understand the confusing and inconsistent terms on tribal court jurisdiction, this Court denies the FTC's motion for summary judgment on Count VII at this time.

### E. Whether the FTC is entitled to the monetary relief sought as a matter of law.

Section 13(b) of the FTCA, codified at 15 U.S.C. § 53(b), grants courts both discretion to enjoin violations of the Act and equitable authority to dispense additional ancillary relief

---

[8]The FTC in the Amended Complaint does not specifically identify which Defendants allegedly engaged in a deceptive practice by using this language in loan agreements. However, the relevant portions of the FTC's briefs and statement of material facts indicate that the FTC may be focusing its allegations in Count VII of the Amended Complaint on PayDay Financial LLC alone.

including awarding monetary relief in the form of restitution or disgorgement.  15 U.S.C. §
53(b); FTC v. Gem Merch. Corp., 87 F.3d 466, 469-70 (11th Cir. 1996); FTC v. Sec. Rare Coin
& Bullion Corp., 931 F.2d 1312, 1314-15 (8th Cir. 1991).  Here, in addition to injunctive relief,
the FTC on summary judgment requests disgorgement of $417,740 from certain Defendants for
their alleged profits from garnishment practices, as well as a civil penalty of $3.8 million.
Defendants contest any such award.  Defendants cite authority that "where the FTC seeks
injunctive relief, courts deem any monetary relief sought as incidental to injunctive relief." Doc.
103 at 35 (quoting FTC v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1202, n.6 (10th Cir. 2005)).
Defendants do not contest the authority of the Court to award monetary relief in the form of
restitution or disgorgement, but dispute the appropriateness of the Court doing so under the
circumstances.

The equitable remedy of disgorgement exists in part to prevent a wrongdoer from keeping
the profits of an unlawful operation or practice.  See SEC v. JT Wallenbrock & Assocs., 440
F.3d 1109, 1113-14 (9th Cir. 2006).  However, disgorgement is not to penalize, but to deprive
"wrongdoers of ill-gotten gains."  CFTC v. Hunt, 591 F.2d 1211, 1222 (7th Cir. 1979).
Accordingly, courts have distinguished between illegally and legally obtained profits when
calculating the amount of disgorgement.  See FTC v. Verity Int'l, Ltd., 443 F.3d 48, 68-70 (2d
Cir. 2006).  To obtain disgorgement, the FTC must show: "(1) that the defendant profited from
violations of the FTC Act; (2) that the profits are causally related to the violations; and (3) that
the disgorgement figure reasonably approximates the amount of unjust enrichment." FTC v.
Magui Publishers, Inc., Civ. No. 89-3818RSWL(GX), 1991 WL 90895, at *17 (C.D. Cal. Mar.
28, 1991); see also Verity, 443 F.3d at 67 (explaining that the proper framework for calculating

disgorgement requires the FTC to show that its calculations reasonably approximate the amount of the defendants's unjust gains, after which the burden shifts to the defendants to show that those figures were inaccurate).

The FTC's request for disgorgement of $417,740 stems from the amount of finance charges, interest, and fees collected by certain of the Defendants through garnishment. Doc. 99-2 at 48-49. The garnishment practices of the Defendants doing collections were violative of § 5 of the FTCA and stemmed in part from clauses violative of the Credit Practices Rule. The Defendants argue, however, that they were collecting moneys owed under the loan agreements by consumers through garnishment. That is, Defendants argue they were not receiving ill-gotten gains, but rather collecting what amounts were owed.

The district court in LoanPointe, 2011 WL 4348304 addressed a similar argument. There, the FTC sought disgorgement of money that the defendants had collected through use of an illegal garnishment packet. Id. at *11. The defendants argued that disgorgement was improper because they were merely collecting money that they were owed under loan agreements. Id. at *11-12. The district court rejected this argument, explaining that although the defendants may technically have been entitled to interest payments under the loan agreements, requiring the defendants to "disgorge the interest they received through garnishment fulfills one of the purposes of disgorgement, which is to make violations unprofitable." Id. at 12. "If Defendants were subject to only an injunction," the district court explained, "the resulting message would be that improper wage assignment clauses can be included in loan applications until discovered, at which point, the only consequence would be to stop violations of the law in the future." Id.

31

This Court agrees with the rationale in LoanPointe, and finds that disgorgement of the $417,740 Defendants PayDay Financial LLC and Financial Solutions LLC collected through their illegal garnishment practices is appropriate. Those two Defendants profited from the illegal garnishment in violation of § 5, the profits—which came in the form of astoundingly high interest rates and fees—were in fact collected through illegal garnishment in the amount of $417,740, and that figure reasonably approximates the amount of unjust enrichment. See Magui Publishers, Inc., 1991 WL 90895, at *17. Disgorgement of $417,740 from the amount illegally garnished allows the Defendants to retain the principal balance of the loans, but requires sacrifice of interest and fees. Indeed, the FTC does not seek, nor would this Court award, disgorgement of the loan principal balances that the Defendants collected through the illegal garnishment. Disgorgement applies to all ill-gotten gains; return of the principal that the Defendants lent to consumers was not actually a "gain" to the Defendants. See LoanPointe, 2011 WL 4348304, at *12. Disgorgement of $417,740 is proper only as to the two Defendants—PayDay Financial LLC and Financial Solutions LLC—that engaged in the garnishment practices; whether there is a "common enterprise" extending to other Defendants remains an open issue.

The FTC also requests a $3.8 million civil penalty to be imposed on the Defendants as a matter of law. The FTC argues for the maximum penalty of $16,000 per day for a continuing violation of the Credit Practices Rule. Doc. 114 at 36. Understating the aggressiveness of such a request, the FTC's brief states "the FTC is merely seeking $3,800,000 for 241 days of a continuing violation in which consumers could not revoke the wage assignment after 10 days of submitting an application." Doc. 114 at 36. This Court declined to grant summary judgment on a portion of the claim of a Credit Practices Rule violation and, while civil monetary penalties

32

may be forthcoming depending on how this case unfolds, it is premature on this record and on a motion for summary judgment to evaluate or assess any such civil monetary penalties—let alone $3.8 million. In assessing the need for a civil penalty, courts routinely consider: 1) the good or bad faith of the defendants; 2) the injury to the public; 3) the defendants' ability to pay; 4) the benefits derived from the violations; and 5) the necessity of vindicating the authority of the FTC. U.S. v. Prochnow, No. 07-10273, 2007 WL 3082139, at *3 (11th Cir. Oct. 22, 2007) (per curiam); FTC v. Hughes, 710 F. Supp. 1524, 1529 (N.D. Tex. 1989). Some of these factors are ones that cannot be decided comfortably as a matter of law on this record. Accordingly, the Court will consider an amount of any civil penalty at trial.

**III. Conclusion and Order.**

At hearings, Defendants have advised this Court that discussions were close to achieving settlement of this case, to which the FTC has responded by representing that the parties were not close on settlement of the case. Perhaps this Opinion and Order will bridge some differences in settlement positions and perhaps it will not. Rather than entering an order including injunctive relief as a part of partial summary judgment, this Court will allow each party until October 23, 2013, to submit any proposed order for injunctive relief consistent with this Opinion and Order and to conclude whatever ongoing settlement discussions there might be.

For the reasons explained above, it is hereby

ORDERED that Plaintiff's Motion for Summary Judgment, Doc. 93, is granted with respect to Count I, a portion of Count IV, and Count V of the Amended Complaint. It is further

ORDERED that Plaintiff's Motion for Summary Judgment, Doc. 93, is otherwise denied based on the existence of what appear at this time to be genuine issues of material fact.  It is further

ORDERED that PayDay Financial LLC and Financial Solutions LLC pay to the FTC $417,740.00 as disgorgement of certain profits.  It is further

ORDERED that the terms of injunctive relief and civil penalty, if any, will be determined by this Court at a later time.  It is finally

ORDERED that the parties have until October 23, 2013, to submit any proposed order consistent with this Opinion and Order and to contact the Court for the purposes of setting a telephonic hearing to discuss how most efficiently to proceed to trial on the remaining issues.

Dated September 30, 2013.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE